And at this time, we'll hear CMS Volkswagen Holdings versus Volkswagen. Good morning. Good morning. Good morning, your honors, and may it please the court. My name is Russell McCrory from Aaron Fox. I represent the plaintiff appellant, CMS Volkswagen Holdings, doing business as Palisades Volkswagen. The district court erred in dismissing and denying leave to replete Palisades claim under subdivision G of the New York Franchise Motor Vehicle Dealer Act. The district court erred in three ways. First, it adopted the reasoning of the district court in Beck Chevrolet when it held the local consumer preferences did not need to be taken into account when setting sales objectives in the incentive program at issue. The New York High Court has since rejected that reasoning and answered to certified questions from this court. And rejected the very metric upon which Volkswagen set its sales objectives in the variable bonus program. Second, the district court improperly imported Robinson-Patman jurisprudence into the dealer act. The dealer act is not the Robinson-Patman act. And in fact, as commentators have noted, exhibits extreme discontinuity with the Robinson-Patman act. Third, the district court misconstrued the second department's holding in Audio Smithtown with respect to the issue of the safe harbor under the statute. Which is that price differences will be acceptable if they are reasonably available to all dealers in the state on a proportionally equal basis. Those are the three broad areas where the district court erred. With respect to local consumer preferences, the New York High Court expressly rejected the reasoning of the district court in Beck Chevrolet. And by extension, the reasoning of the district court in this case. The New York Court of Appeals held that it was unfair, unreasonable, and arbitrary for General Motors in the Beck Chevrolet case to evaluate a dealer's sales performance based solely on a state market share adjusted only for segment popularity and not taking into account any other local market conditions and consumer preferences. Most notably, the court in Beck Chevrolet mentioned brand preference. The court held that for a sales performance standard to pass muster, it must take into account local consumer preferences and local market challenges, including brand preference. That alone is dispositive, I believe, of the district court's, of this appeal. The very same metric at issue in Beck Chevrolet is at issue here. The only difference is Volkswagen uses regional market share and General Motors uses state market share. Otherwise, the metric is the same. A metric that- The metric may be the same, but the purpose of the sub-subsection is quite distinct. Because in Beck, they were talking about taking away somebody's franchise. And here, we're talking about an incentive program. And Beck made plain that it should not be over read. It almost limited itself to its facts, and they're there at the end. Your Honor, the New York Court of Appeals was very specific in that it did say in one sentence that the courts don't want to get involved in micromanaging. That's one sentence, but that's a good sentence for you. But the very next sentence is a very good sentence for me, where it says that where the New York legislature has decided to regulate, the courts will step in and regulate. The New York legislature has regulated price differences. Not price discrimination we can use as a shorthand, but price differences. A metric that the New York Court of Appeals has already found to be unfair, unreasonable, and arbitrary. To evaluate sales performance suffers all the same legal infirmities when it's also used to set a sales objective in a program that affects price. Let's take this one hypothetically. You're saying that it was unreasonable not to take into account regional or local customer preferences as to whether to buy German cars, for example, right? But should they take into consideration whether there's a bias against cars from Asia or Korea as well? Should they consider vehicle size, because some lines of cars are big and some are small. Should they consider customer preferences on gas efficiency or people's price sensitivity, I don't want to mention the word diesel. Some people, you have customer preference for high performance cars or good local transportation. It would seem to me when you get into the area of customer preference, it becomes almost impossible to have a price incentive program. Well, Your Honor, first of all, all of those types of consumer preferences are basically available from the data that is, that is the same data that provides segmentation adjustments can also provide all these other adjustments. Is it registration data? When a car is registered in every state, New York is the same as any other state. You don't talk to consumers, you just look at the data of what they're buying. Correct. When a car is purchased, it's registered with the DMV. It's registered to an address. The registration knows the customer from this address purchased this car, knows whether it's a high performance car, knows whether it's a German car, knows whether it's an Asian car. Where do you draw the fact that in Westchester, the buyers seem not to like foreign vehicles? That's not from registrations. It is, Your Honor, because the data knows whether it's a Chevrolet, or whether it's a Volkswagen, or whether it's a Chrysler, or whether it's a- So they don't seem to be buying foreign made vehicles. Right, and that exactly was the issue in Beck, is that the Chevrolet brand in particular, and domestics in general. Domestics also suffered in downstate New York in the Beck Chevrolet case. That when you are judging by a large broad metric, and are only taking into account segment popularity, you're missing a large portion of what the consumer preference is out there. And the New York Court of Appeals was very specific, and it said- We aren't talking about US made cars, we're talking about foreign brand, or US brand. Correct. Because, I mean, foreign brand cars are made here in the United States, many of them anyway. Yeah, there are Honda plants in the United States, exactly, but the Honda brand, whether the car itself is made in Arkansas or made in Japan, is considered a foreign brand nameplate. But all of this data is available, so the idea that it can't be adjusted for is simply not true. So it can be adjusted for all the things that I mentioned? Exactly, Your Honor. It can be adjusted for, and the New York Court of Appeals says you have to adjust for it. That's exactly what the New York- Don't you think that would lead to a bit of litigation? I'm sorry, Your Honor. Don't you think that would lead to enough litigation so that companies would basically say, it doesn't make any sense for us to offer price incentives, and that hurts all the dealers? Your Honor, there are plenty of price incentives. Volkswagen has a price incentive program right now. What it doesn't do is base sales objectives on the same metric anymore. It voluntarily discontinued that piece of the program. The Volkswagen, all these different brands have their own version of a price incentive program. Not all of them, in fact most don't, run afoul of the state laws like New York Subdivision G here. This particular piece of it did. Beck says, decisions about how best to improve the quality of dealerships and increased dealer sales involve business judgments rightly left to franchisors and not the courts. Right, and the very next sentence says, but where the court, when the legislature has specifically regulated an area and given it to the courts to pass judgment on that, the courts will step in. This subdivision G is just like subdivision GG. They both are areas where the New York legislature has expressed- Except that the wording is different. I mean, there's the safe harbor. The safe harbor, and that's really the Audi of Smithtown case. Yes, exactly. If you'll go ahead. You can ignore the red line. The Audi of Smithtown case directly addresses the issue of the safe harbor. And the Audi of Smithtown case, I think the district court here got it wrong. The critical, the piece of the program at issue that I think is important was called the CPO Purchase Bonus Program. Just like this case, it paid a percentage of MSRP based on each vehicle sold. It created a whole new, a whole different category of dealers. Those are the new dealers, and they were preferred. They were preferred over everybody else regardless of how they performed or what they did. But the fact that new dealers, because they did not have incoming lease returns and so they could not have a lease buyback off lease purchase requirement. That was not the reason that the second department found the program illegal. It was not simply that there was a different standard. There had to be a different standard because new dealers don't have a portfolio of leases coming back in. The reason why the program failed was because it was much more difficult and more expensive for existing dealers to earn the money. That is what the second department focused on. And this goes to the very important point. The plaintiff dealers in Audi of Smithtown earned the bonus. They received the money. And normally in Robinson Pappin, that would be fatal to the case. That would be the functional availability test. The fact that those plaintiff dealers earned the bonus, got the money, but it was still illegal because they had to pay more to earn the bonus and it was more difficult for them to earn the bonus. Shows that the test under the statute is a very narrow safe harbor. It's not a broad safe harbor. Here there are two very important factors. The one we just spoke about, where the brand preferences are against Volkswagen in that market. And secondly, the fact that the nearest competitor, the one we're complaining about, receives an artificially small market territory that reduced the sales objectives, made it extremely easy for that dealer to get the money. That is Audi of Smithtown. Just like the new dealer in Audi of Smithtown, the new dealer in this case was given an unfair artificial advantage in the form of a smaller market territory. That's no different than the- Is that the subject of your motion to file an amended complaint? Yeah, the issue of the artificially small territory is alleged in the complaint. It's alleged perfunctorily in one sentence. You couldn't know what it was about. Well, part of the problem is we were pleading without a fully developed factual record. We knew that the objectives for Lash were lower. We knew that it had a small territory. We don't know why Volkswagen did it. We don't know the reasons behind it. That's- But your brief says it's because it has a vacant territory next to it. Right, but the reason why- Where a dealer could be moved in tomorrow. But the reason why a manufacturer chooses, or this particular manufacturer chose to create an open point, was not available to us without- When are these territories created or defined? When you- Well, that's what's unusual about this, Your Honor. I mean, this is- You mean unusual about Volkswagen, or unusual about this case? Unusual that there was an open point created here in a metro market. No, but I mean, forget about the open point. The open point, Lash, your client, everybody has their sales territory. Who draws them, and when do they come into being? Are they altered, and who alters them? The manufacturer typically alters them. There's two methods to determine them. One is by zip code to census tracts. It's usually what zip code or census tract is closer to each dealer. In a metro market where there's a lot of dealers, there tends to be no unassigned territory or open points. So the markets tend to be contiguous to each other. And that's what made this so unusual, is that in a metro market, Westchester County, why Lash would have unassigned territory right next to it? That gave it a specific and unfair advantage, as opposed to dealers who didn't have that. Thank you. Thank you, Your Honors. Good morning, Your Honors. My name is Randy Weller. I'm here today on behalf of Volkswagen of America. I think we believe that there are two fundamental problems with the position that Appellant Palisades is taking in this case. The first one really goes back to the interpretation of the statute that they are giving this court. And the second one deals with the pleading issues that are issued in the court. I'd like to talk about each of those. One is the statutory interpretation, and the other one is dealing with the pleading issue. As a matter of statutory interpretation, the position that the appellant is taking in this case is that the statute, the safe harbor in section 463.2g, requires a manufacturer to set up incentive programs such that it provides absolute equality of opportunity to every one of its dealers. In other words, their position is that in order for the safe harbor to apply. There must be no safe harbor. There must be no safe harbor. Because the only way, they're saying any time any dealer must have to sweat harder than any other dealer has to sweat. Then the safe harbor doesn't apply. And I think as, that Jacob, as you pointed out during the earlier portion of this argument, that as a practical matter, there is no way a manufacturer ever could know ahead of time what other factors might come into play. That may be, but it looks like, I mean, it looks like you're falling between two stools. Because on the one hand, you have Beck, which said you have to consider consumer preference for things like the very things that are at issue in this case. And on the other hand, you have the Audi case, which treats that kind of thing as applicable to incentives. And incentives where some dealers have a big advantage over others. Let me see if I can address each of those cases, because I do think that- By all means, but treat them together, because that's what your adversary is doing. He's relying on two cases, and if you put them together. Let me see if I can try to put them together. You have trouble. Let me start with Beck first, and then Audi of Smithtown. The fundamental point of Beck was that the court could determine, as a matter of law, that the use of this market share standard was unlawful with respect to a particular New York statute. 4632GG makes it unlawful for a manufacturer to use an unreasonable performance standard when it is determining whether a dealer is complying with a dealer agreement. So what the New York Court of Appeals said was, in the context of that particular statute, when the question is whether a standard is being used to determine a dealer's compliance with a dealer agreement. Whether that standard is reasonable or not, we're not going to have it be a question of fact. We're going to make it a question of law. But the wording does seem, it's not identical between G and GG, but it's similar. Well, I think one regulates the standard. Is the standard itself reasonable? The other, by the way, regulates price discrimination, and then creates a safe harbor. And the safe harbor says, if it's reasonably available on a proportionally equal basis, the incentive program is entitled to the safe harbor. I sure wish they had identified, if they had defined those terms. They didn't, but I think that the question there, this is where I think the language in Beck that you're pointing out comes into play. That with respect to the safe harbor, we believe it should be a question of fact. Is this incentive reasonably attainable by the dealer? That when Beck has the language in its decision that says, we're not to regulate what a manufacturer does, how a franchisor runs the rest of its affairs. I think what they are trying to say is that in the context of determining compliance with a dealer agreement, we will apply a per se rule. However, in other contexts, we are not going to tell the court to substitute a question of fact for a fact finder for a question of law as a per se matter. Are you saying this is a matter of fact for a fact finder? Because in that case, you're headed for a jury trial, right? I think if they can plead the case, which I do not believe they have, and we can talk about it in a moment. But I think the question is, whether it is reasonably available is a question of fact. And if you take a look at the language that Ms. McCrory makes a lot of at the end of that quote that you read about the fact that the legislature has chosen to regulate in certain areas, I believe the sentence there is, let me see if I can find it, nevertheless, legislature by its enactment of the Dealer Act has determined it is in the interest of the state to subject the franchisor's performance standards to statutory limits in order to prevent unfair business practices, and has seen fit to place review of franchisor standards squarely within the authority of the courts. That is referring specifically to the language of 463-2GG where the legislature has set a performance standard for purposes of determining compliance is subject to a review of reasonableness, and the court applied a per se standard. Under 463-2G, the price discrimination statute, the question is not a matter of law, but the question is a matter of fact, is this standard reasonably attainable by the dealer? I think if we then move on to the Smithtown case, which is the other one that you referred. Let me take a step back as I get into that. I think we make much in the briefs about how the Robinson-Pattman Act should be used to interpret 463-2G. But even stepping back from the Robinson-Pattman Act a second, looking at the plain language of the statute. The plain language says an incentive program needs to be two things. Reasonably available, in other words, it has to be reasonable for the dealer to be able to attain it, and second of all, it has to be proportionally equal. The concept of proportionate- What has to be proportionally equal? The qualification eligibility criteria within the program needs to be proportionally equal. Proportionate to what? So as an example, well, that's a very good question. I think the statute does not indicate what it needs to be proportionally equal to. I think the question is, is the statute made proportionally equal to something relevant? I think that's where the Robinson-Pattman case law comes in very importantly, because Robinson-Pattman focuses on size. The purpose of price discrimination is to make sure volume discounts are not given to large dealers. So a proportionality does two things. It looks at a measurement that can vary between two dealers, and then the concept of proportionality says it must vary by a constant. In other words, it needs to vary by some sort of non-discriminatory formula when you measure between dealers. If you take a look at the situation in the Smithtown case, and there's a quote here, that the Smithtown case did not find that the problem with the Audi program there was the fact that it was easier for one dealer to meet the standard than another. That's not what the court found. The court found that there were two separate sets of criteria. So the court writes, and this is the trial court. There is no manner in which the bonus offered on new automobile sales under the CPO program to new automobile dealers is proportionally similar to the bonus offered to existing dealers. In other words, it wasn't one measurement that applied between the dealers that got varied because of some sort of formula that uniformly, non-discriminatorily was applied. The issue was there were two different programs, two different standards. And what the Smithtown case found was that when you wind up having an incentive program that has two different standards that apply, there's no way that incentive program can be proportionate, it just cannot be. So the question, we believe that the statute does not stand for the proposition that the court should look at whether or not it's easier for one dealer than another to meet the standard, and that's the criteria for the safe harbor. But instead, first of all, is the standard adjusted between dealers based- Yeah, if it's easier for one dealer to meet the standard than another, because it sells more cars, then that would seem to run afoul of what you were conceding. I think what's not proportionate would be an incentive program that says, if a dealer sells 100 cars, the dealer earns the incentive. And that applies to every dealer, regardless of the dealer's size. There's no proportionality in that. Regardless of the size of their territory? Yes, let's just say, yeah, any dealer anywhere in the United States of America that sells 100 cars during a given month earns the bonus. That's not proportion. There's no factor that varies between dealers that's taken into account, and no factor that's taken into account in some form of non-discriminatory formulaic matter. Market share. When you look at market share, and you look at the fact that a market for one dealer may be bigger, and a market for another dealer may be smaller, and then you go ahead and modify the dealer's sales objective based upon the size of the market, based upon a uniformly non-discriminatory formula, what you do is you have a proportionate standard. And that's, I believe, the R.J. Reynolds case gets into that point, that proportionality, there's a presumption of proportionality, a presumption of proportionality, when you have a measurement that varies between dealers, and that's taken into account and setting the standard based upon a uniform formula on how it's done. We believe what the statute here says is this. First of all, in setting an objective under an incentive program, the first question is whether or not the standard has been adjusted between dealers on a proportionate basis. And second, after it's been adjusted on a proportionate basis, is it reasonable for the dealer to be able to obtain that standard? So is it proportionate in some manner, based on some objective fact? And second of all, after so adjusted, is it reasonably attainable by the dealer? I wouldn't say you're rewriting the statute, because there are no definitions. What you're saying is plausible, but it's as though you're writing a statute that would make perfect sense. And I'm not altogether sure that's the statute we are looking at. Well, I think it makes sense, plain language out of reasonably available, and out of proportionally equal. I would suggest that appellant's version of the statute, which is, is it easier or not, effectively is created solely out of whole cloth. The appellant makes much to do that the Robinson-Patman Act should not be used to interpret the state statute. Under what circumstances have we looked to Robinson-Patman for these kinds of price discrimination matters in the states? because you know these dealer act cases can be sui generis. Understood. I think that when you take a look at the purpose of the Robinson-Patman Act and the language on price discrimination itself, I think that you see the purpose of statute is the same with respect to regulating price. What I want to point out for you, and I think this is important, that in their briefs, in their opening brief, appellants actually say that the New York Dealer Act, the New York Dealer Act is comparable to section 13D and E of the Robinson-Patman Act. If you look at their opening brief at page 46, they actually say in their brief that the statute between 13D and E is effectively the comparable statute to the New York Dealer Act that we've been referring to. Both 13D and E, by their explicit statutory language, explicit statutory language, incorporate the functional availability defense that in almost similar identical words as it is in the New York statute. And so I think by what plaintiffs themselves have said, trying to distinguish section 13A, they've admitted that 13D and 13E, which have a safe harbor and a function ability defense, is the same as the Dealer Act. If you then take a look at how function availability has been applied in practice, it supports the interpretation of the statute that I think I spoke about a few moments ago. Thank you. Thank you. Your rebuttal. Thank you. I do agree with counsel on one important point, which was when he said that these are questions of fact. This was a motion to dismiss and a denial of leave to replete. I agree that these are questions of fact, and for that, again, that reason alone, this decision should be reversed. In no uncertain terms, Volkswagen put their thumb on the scale in favor of Lash. And that is by having the artificially small market territory. The- I just heard opposing counsel say the size of the market is normalized by applying some statistical test to make them equal, or at least have an equal opportunity to achieve the benefit of the program. And they normally are, but not in this case. It is the unassigned territory, the open point next to Lash, that takes it out of that normalized scenario. When you have unassigned territory next to a dealer, that dealer is closer to that territory, has a sales advantage to sell into that territory, but no responsibility for that territory. It doesn't increase their sales objectives, but it does increase their sales. Yeah, is the plaintiff also adjacent to the unassigned territory? No, Your Honor, no. Now, in terms of Audi of Smithtown, the court, I think, was very clear in that. It said that the program at issue, the CPO Purchase Bonus Program, did not satisfy the safe harbor for a variety of reasons, most of which is because it was more difficult because it cost the existing dealers more to earn the money. And there were other structural factors. For example, the sales objective that the new dealers had provided a structural advantage, because they could only buy the hot cars and reach their sales objectives more easily than an existing dealer. So it was most definitely about the comparative ease in which different dealers can earn the money. And contrary to what counsel said, I'm not saying they have to be exactly equal, proportionally equal. This was not a proportionally equal standard. The metric was rejected already by the New York High Court. And on top of that, there's the artificial imbalance in the market territories assigned to each dealer. Thank you. Thank you both. Reserve decision, and at this time we will take a ten minute adjournment. Court stands at recess.